ROBERT S. ODELL & CO. v.
UNITED STATES.

No. 45604.

Court of Claims.

Nov. 5, 1945.

Llewellyn A. Luce, of Washington, D. C. (Theo. J. Roche and James Farraher, both of San Francisco, Cal., on the brief), for plaintiff.

J. W. Hussey, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and WHITAKER, JONES, LITTLETON, and MADDEN, Judges.

WHITAKER, Judge.

This is a suit to recover taxes assessed and collected on the sale of Shanghai dollars in 1934 and 1935. The tax assessed was that levied on the sale of silver bullion. Plaintiff says that it sold, not bullion, but foreign coinage.

Section 8 of the Silver Purchase Act of 1934, c. 674, 48 Stat. 1178, 1179, 1181, added the following to Schedule A of Title

VIII of the Revenue Act of 1926, 26 U.S. C.A. Int.Rev.Acts, page 300:

"10. Silver, and so forth, sales and transfers.—On all transfers of any interest in silver bullion, if the price for which such interest is or is to be transferred exceeds the total of the cost thereof and allowed expenses, 50 per centum of the amount of such excess. * * *

"The term 'silver bullion' means silver which has been melted, smelted, or refined and is in such state or condition that its value depends primarily upon the silver content and not upon its form."

■ The question presented is whether or not these Shanghai dollars were "silver bullion" within the meaning of the above-quoted section of the Silver Purchase Act of 1934.

In July and August 1934 the Wells Fargo Bank of San Francisco, California, at plaintiff's instance, purchased from P. & O. Banking Corporation in Shanghai, China, 1,310,000 Shanghai dollars, for immediate delivery. In due course they arrived in San Francisco and were placed in the bank's vaults.

In August and September of 1934 plaintiff purchased from the Wells Fargo Bank 410,000 of these dollars at 37.35 cents each, and 160,000 dollars at 36.45 cents each. In September 1934 plaintiff purchased from the bank an additional amount of 230,000 of these dollars at 36 cents each. On December 20, 1934 it sold these 230,000 dollars back to the bank at 40.5 cents each, realizing a profit of $10,350.00, which it reported on its tax return for 1934 as a capital gain. On the same day it purchased from the bank, for delivery on May 1, 1935, the same amount of Shanghai dollars, that is, 230,000, at 40.7 cents per dollar.

On August 15, 1935, plaintiff sold to the P. & O. Banking Corporation of London, England, all of the 800,000 Shanghai dollars it had purchased from the Wells Fargo Bank. It sold 400,000 of them at 48.3 cents a piece, and 400,000 at 48.325 cents a piece, realizing a gross profit of $81,435.00. It reported $81,048.50 of this amount as a capital gain for the calendar year 1935.

This profit of $81,048.50 and the profit of $10,350 realized on the sale in 1934 were taxed by the Commissioner of Internal Revenue as sales of silver bullion.

Two days later the P. & O. Banking Corporation of London sold these 800,000 Shanghai dollars to the Pacific States Savings & Loan Company, of San Francisco, for $390,400, which was $3,800 more than it had paid for them. This sale was arranged by Robert S. Odell, who represented not only plaintiff, Robert S. Odell Company, but also this Pacific States Savings & Loan Company. The following year, February 1936, the Pacific States Savings & Loan Company, acting through the Wells Fargo Bank, had these 800,000 silver dollars taken to the mint at San Francisco where they were melted into silver bars. These weighed 611,340.60 ounces, .999 fine. These silver bars were sold to the Wells Fargo Bank, agent, for $273,574.92. In the same year the Wells Fargo Bank, agent, sold them to the Bank of America at a loss of $1,042.14.

The purchase and sale of these dollars was made under the following circumstances: The dollars were legal tender in China. They had the same currency value as Shanghai paper dollars. However, as a result of inflation the value of a Chinese dollar in the United States on December 20, 1934, the date of the first sale by plaintiff, had declined to about 34 cents. On this date silver, .999 fine, was quoted on the New York and San Francisco Exchanges at from 54¼ cents to 54⅜ cents per ounce. The silver content of a Shanghai dollar, after the dollars had been melted to eliminate alloys, was consistently in excess of ¾ of an ounce. Consequently, the value of the silver in a Chinese dollar on December 20, 1934, was approximately 40½ cents, or about 6 cents more than it was worth on United States Exchanges as Chinese currency.

Likewise, on August 15, 1935, the date of the second sale, Shanghai dollars were quoted in the United States at about 37 cents. On the same date silver was quoted on the New York and San Francisco Exchanges at 65⅝ cents per ounce. The silver content of a Shanghai dollar, therefore, was worth nearly 49 cents, or about 12 cents more than a Shanghai dollar was worth as currency.

On the date of both sales, therefore, the silver content of a Shanghai dollar was worth considerably more than a Shanghai dollar was worth as Chinese currency. The question, therefore, is whether or not the sale of foreign coinage still current in the country which had coined it, but whose silver content made it worth more for its

silver than it was worth as a coin, is to be taxed as a sale of silver bullion, or as a sale of money.

This question finds its answer in the definition of silver bullion as contained in the Silver Purchase Act of 1934. It is defined as "silver which has been melted, smelted, or refined and is in such state or condition that its value depends primarily upon the silver content and not upon its form." These dollars, of course, had been melted, smelted, and refined, and it is unquestionably a fact that their primary value was on account of their silver content, and not on account of the fact that they were coinage guaranteed by the faith and credit of the Government which had issued them. A person having them for sale was able to realize on them an amount substantially in excess of their value as Chinese coins because of the fact that their silver content made them more valuable than they were as coins. This demonstrates, of course, that they were valuable primarily for their silver content, and not by reason of the fact that they had been cast in the form of a Chinese dollar.

When the plaintiff made its sale in 1934 it realized for them 40.5 cents each, whereas at that time they were worth not in excess of 34¼ cents each as Chinese coinage. From the sale in 1935 plaintiff realized 48.3 cents each for 400,000 of these dollars, and 48.325 cents each for another 400,000, whereas on this date the maximum that could have been realized in the United States for them as Chinese coins was not in excess of 37⅛ cents each. The plaintiff was able to realize these prices because of the fact that they were more valuable for their silver content than they were as coins. It seems clear, therefore, that the value of them depended "primarily" on their silver content, and not on the fact that they were in the form of Chinese currency.

It is true that when the sale was made to the P. & O. Banking Corporation of London on August 15, 1935, these coins had not been weighed or assayed for their silver content, nor was any warranty given as to their weight or fineness. However, it is plain that they were purchased for their silver content and not because they were Shanghai currency.

In the first place, this bank paid for them an amount quite substantially in excess of what they were quoted as Shanghai coins.

In the second place, the correspondence between the parties clearly shows that they were purchased for their silver content and not because they were Chinese coins. In a letter written the P. & O. Banking Corporation at Shanghai by the Wells Fargo Bank it was stated that its clients might prefer to sell these coins as Shanghai dollars on account of tax regulations, and it was suggested that this company's London office, to whom they expected to sell the dollars, could ascertain from the records of the Shanghai office "the comparative fineness" of the dollars which had been purchased from the Shanghai office. In the past, it was stated, these dollars had produced .764 ounces of silver, and that the only other factor to be taken into account was "the cost in London of melting the dollars into bars."

In reply the Wells Fargo Bank was advised by the Shanghai office that their experience had shown "that the average fineness of the old Chinese Provincial dollar, after melting, is about .82619 standard ounces."

The Shanghai office of the P. & O. Banking Corporation had sent to its London office a copy of the letter of the Wells Fargo Bank to it of December 12, 1934; no doubt it also sent a copy of its letter to the Wells Fargo Bank of January 8, 1935, in which it had said that the average fineness of the old Chinese Provincial dollar was about .82619 standard ounces. At any rate, as a result of the correspondence between the parties, the London office of the P. & O. Banking Corporation purchased from plaintiff the Shanghai dollars at a price considerably in excess of their value as Shanghai coins. It is quite evident, therefore, that they were purchased not for their value as coins, but on account of their silver content.

We think this particular transaction between the parties shows that the primary value of these coins was on account of their silver content and not on account of the fact that they were Shanghai currency.

Under the Regulations of the Treasury Department, which was charged with the duty of administering this Act, these dollars were unquestionably silver bullion. Article 20(i) of Treasury Regulations 85, promulgated under the Revenue Act of 1926, which was amended by the Silver Purchase Act of 1934, states that "Scrap silver is silver bullion." Article 20(k)

states: "The term 'scrap silver' includes * * * silver coin which is no longer held for the purpose for which it was processed, manufactured, or coined." It is quite evident that these Shanghai dollars were purchased and held by plaintiff, not because they were Chinese coins, for which purpose they had been originally "processed, manufactured or coined," but on account of their silver content.

These Regulations, promulgated by the agency charged with the enforcement of the Act of Congress, are, of course, under numerous decisions, entitled to great weight, and since we think they are reasonably adapted to the enforcement of the Act, they have the force and effect of law. Under them these sales were properly taxed as sales of silver bullion.

Plaintiff relies on certain articles of the Silver Regulations issued by the Treasury Department on August 17, 1934, pursuant to the powers conferred on the President by the Silver Purchase Act, approved June 19, 1934, 48 Stat. 1178, and the Executive Order of the President issued thereunder, dated August 9, 1934. These regulations do not convince us that we are wrong in interpreting the intention of Congress in the enactment of this Act.

The conclusion at which we have arrived is in accord with that arrived at by the United States District Court for the Northern District of California in the case of Wells Fargo Bank and Union Trust Company v. Anglim, 63 F.Supp. 790.

We are of opinion that the tax was properly assessed and that plaintiff is not entitled to recover. Its petition will be dismissed. It is so ordered.

JONES and LITTLETON, Judges, and WHALEY, Chief Justice, concur.

MADDEN, Judge, took no part in the decision of this case.